## V    Statement of Claim
### The Excessive Heat Facts

(A) Calton's Disabilities Puts Him At An Increased
Risk of Heat-Related Injury or Death

(1) Allen "F" Calton the Plaintiff [Hereafter referred to as
Calton] is a 55 year old black male. who is incarce-
rated at a Texas Prison the John B. Connally Unit in
Karedy i Texas. Which is situated near the San Antonio
metro Area. if not therein

(2) Calton is serving a Life sentence For Attempted murder
and will not be eligible for Parole until 2032.

(3) Calton suffers from several medical conditions and/or dis-
abilities that increase his risk of heat-related injury or
death. In particular Calton suffers from the cardiovascu-
lar disease Hypertension.

(4) Calton's Hypertension requires treatment with Lisinopril (an
Ace Inhibitor) and the diuretic (Hydrochlarothiazide)
to maintain a safe blood pressure level.

(5) Calton is prescribed the beta blocker (propranolol) to
prevent reoccurring painful severe headaches

(6) Calton is prescribed Dilantin to treat the chronic nerve
pain he experiences in his hands and wrists. (Dilantin is
an anticonvulsant that also has pain-relieving properties

(7) Calton also suffers from mental illness and has been
diagnosed with major depression with severe psychosis.
For which Calton is prescribed Haldol (an antipsychotic

## I. Statement of Claim

medication) and the major depression medication Wellbu-
trin. Calton is also prescribed an antihistamine (Diphen-
hydramine) as a side effect medication for the Haldol

(8) These disabilities and medications impair Calton's thermo-
regulatory system. Resulting in TDCJ'S Medical And
mental Health providers to determine that Calton cannot
perform forced labor in "direct sunlight" or "extreme tem-
perature" or "extreme humidity". Yet Calton gets no pro-
tection from the indoor heat and humidity in his hou-
sing area. See Exhibit "A" hereto attached and incorporated.

(9) Heat aggravates Hypertension and has caused Calton to
experience extreme fatigue and dizziness in the past during
May thru September 2020, May thru September 2021 and
May thru September 2022.

(10) Calton often feels nauseated over the aforementioned
time periods and has become lightheaded countless times
due to extreme heat and humidity

(11) Calton has also experienced elevated heart beats and dif-
ficulty breathing performing minimal activities such as wal-
king during the aforementioned months of 2020, 2021
and 2022 due to extreme heat and humidity.

(12) Calton's Hypertension and the treatment of the same
with the diuretic (Hydrochorothiazide) causes his body
to constantly fight to stay hydrated and Calton's

## V   Statement Of Claim

heart struggles to pump enough blood to his skin to cool his body during the aforementioned months 2020, 2021 and 2022 due to extreme heat and humidity and his ability to sweat is extremely limited in such an essentially dehydrated state and condition.

(13) Calton has difficulty standing, walking, lifting light objects, or otherwise minimally exerting himself physically without feeling chest pain, dizziness, lightheadedness, and fatigue during the aforementioned months of 2020, 2021 and 2022 due to extreme heat and humidity in his cell and housing area. Including simply brushing his teeth in his cell.

(14) Because of his Hypertension and the adverse effects from the extreme heat and humidity in his cell and housing area Calton endured during the aforementioned months of 2020, 2021 and 2022. Resulted in Calton to experience difficulty concentrating, thinking, reading and sleeping.

(15) Calton's Hypertension also interferes with the operation of several of his major bodily systems, including his circulatory system and digestive system i.e. Calton experiences severe constipation resulting from dehydration. In turn causes painful bowel movements during the aforementioned months of 2020, 2021 and 2022.

(16) When his cardiovascular disease is exacerbated, strained and/or rendered uncontrolled in the extreme heat and humidity during the aforementioned months of 2020, 2021 and 2022.

Section 1983 Complaint page 27 of 72

## V Statement of Claim

Calton suffered from difficulty breathing and experienced chest pain in the high temperature in his cell and housing area. As a direct result of Calton's cardiovascular disease and Hypertension that impairs his respiratory, circulatory, and cardiovascular system due to extreme heat and humidity.

(19) Although Calton tried to stay hydrated during the summer months of 2020, 2021, and 2022 by drinking gallons of water everyday. Calton experienced severely painful heat cramps in both legs at night that resulted in the interruption of sleep on a nightly basis. On many occasions the pain was so severe Calton would cry out in pain.

(18) During the summer months of 2020, 2021 and 2022 the extreme heat and humidity in Calton's cell made it difficult to sleep. Calton sheets and mattress would be soaked with sweat from Calton profusely sweating throughout the night.

(19) During the summer of 2020 Calton was assigned to 3C-27 bottom in Three Building. Which back wall remained hot until the early hours of the next morning. From the previous day's heat and sun rays shining on the back wall of Calton's cell. Which faced west. The back wall remained "hot to the touch" in Calton's cell hours after sunset. Ditto the steel guard on the window on this wall. That must be avoided while sleeping due to the steel was "hotter to the touch" than the concrete wall.

Section 1983 Complaint page 28 of 72

# II Statement of Claim

(20)  During the summer of 2021 Calton was assigned to 3C-53 bottom in Three Building. which back wall remained hot until around midnight. From the previous days heat. The back wall remained "hot to the touch" in Calton's cell hours after sunset. Ditto the steel guard on the window on this wall. That must be avoided while sleeping due to the steel was "hotter to the touch" than the concrete wall.

(21) During the summer of 2022 Calton was assigned to 3C-5 Bottom in Three Building. Which back wall remained hot until the early hours of the next morning. From the previous days heat and sun rays shining on the back wall of Calton's cell which faced west. The back wall remained "hot to the touch" in Calton's cell hours after sunset. Ditto the steel guard on the window on this wall. That must be avoided while sleeping due to the steel was "hotter to the touch" than the concrete wall.

(22) The buildings that make up the Connally unit where Calton is generally housed. walls were constructed with concrete with no insulation. These concrete walls absorb the radiant heat and heats the inside of the cells beyond the outside temperature. During the summer months the inside of the cells where prisoners sleep feels like an oven.

(23) There is no air condition or any other type of climate control system to maintain a reasonable temperature

## II  Statement Of Claim

i.e. 88 degrees heat index or lower at the Connally unit in the general population housing area. Including both the dayroom and cells where Colton is generally housed.

### (B)  The Vast majority of TDCJ's Inmate Housing Is Not Climate Controlled

(24)  TDCJ imprisons over 150,000 prisoners system-wide, there are only 551 beds available with air conditioning for inmates with medical conditions system-wide. These extremely limited beds are reserved for the patients at the most extreme risk of heat-related illness (such as advanced-stage cancer patients), and are not available even for patients with multiple conditions that make them more susceptible to heat-related illness, injury, or death like Colton. TDCJ's medical providers have testified before the Texas Legislature that these beds are filled by inmates who are so sick that they will never recover, and will likely die in them. The Court should take Judicial notice that prior litigation in Cole v Collier Civil Action No. 4:14-cv-1698 required TDCJ to lower the temperature at the Pack unit.

(25)  TDCJ's medical provider, the University of Texas medical Branch, has testified there simply are not enough beds system-wide to accommodate even the

Section 1983 Complaint page 30 of 72

## V Statement of Claim

prisoners with serious medical conditions who are at greater risk of heat-related illness, injury, or death.

(26) Dr. Glenda Adams, one of the senior medical providers at UTMB who has been designated as an expert witness in the heat stroke wrongful death litigation, testified as follows:

Q: So that utilization Review Committee is really performing some sort of triage situation, is that right?

A: Pretty much. That's a fair description.

Q: Do you know how many of those triage beds or cells you're talking about?

A: How many are there?

Q: Yeah.

A: Absolutely ... there were 471 [in 2011]. We now have 481 [Dr. Adams testified about the beds available to the university of Texas Medical Branch, which provides health care to the majority of TDCJ prisoners. The Texas Tech University Health science Center, which also provides care to TDCJ inmates, has additional beds available. Together, the UTMB and Texas Tech beds total 551. The Connally unit is served by UTMB]

Q: Well, do you think that's enough to protect the prisoners who are susceptible to extreme heat or are especially vulnerable to extreme heat?

A: No, but it's all we have.

Section 1983 Complaint page 31 of 72

## V Statement of Claim

Q: I understand that. And what you're telling me is 'look, this is an impossible situation. We have to eva-luate really serious conditions on down and perform almost like a M.A.S.H. unit would in war to determine who gets these 481 beds,' right?

A: Essentially, yes.

(27) This testimony establishes TDCJ knows it does not have enough air-conditioned beds to safely house prisoners at risk of heat-related illness, injury or death.

(28) In other litigation, TDCJ has admitted it "knows of the high temperatures within its prison and regards it as a potential risk to the health and safety" of prisoners.

(29) There is no penological purpose behind refusing to provide prisoners who are at risk of heat-related illness, in-jury or death with climate-controlled housing.

(30) In fact, the state of Texas requires county jails to keep indoor temperatures between 65 and 85 degrees. See 37 Tex. Admin. Code § 259.160.

(31) In fact, the comment to the American Correctional Association standards instructs prisons to be able to "mechanically lower" temperatures in inmate housing areas. TDCJ deliberately violates this instruction as indoor apparent temperatures at the Connally unit cannot be mechanically lowered.

Section 1983 Complaint page 32 of 72

## V   Statement Of Claim

(32) Most TDCJ prisons, including the Connally Unit, were built after air conditioning become common in public buildings in Texas.

(33) Most maximum-security federal prisons in hot climates, like Texas, are routinely air conditioned. Even the prison housing terrorism-suspects in Guantanamo Bay, Cuba was air conditioned.

(34) Indeed, TDCJ officials made an intentional decision not to air condition the prisoner housing areas at the Connally Unit. And, upon information and belief they did so for political and financial reasons.

(35) Moreover, despite their knowledge of numerous heat-related injuries occurring indoors, all of which would be prevented with air conditioning, TDCJ, including Bryan Collier, and the Texas Board of Criminal Justice, including Patrick L. O'Daniel, have intentionally decided to continue exposing prisoners such as Calton to extremely high indoor apparent temperatures at the Connally Unit despite acknowledging these high indoor apparent temperatures put inmates at risk of heat-related illness, injury, and death

(C) Temperatures Inside The Connally Unit
    Are Dangerously High During The Summer

(36) The Connally Unit is situated in Kenedy, Texas. Kenedy is very near if not a part of the San Antonio Metro area.

Section 1983 Complaint page 33 of 72

## II  Statement Of Claim

(37) On the Connally Unit the television and radio stations prisoners watch and listen to respectively are from the San Antonio.

(38) The weather in the San Antonio metro are is generally indistinguishable for the weather Calton experiences in Kenedy, Texas at the Connally Unit.

(39) On or about 5-16-22 temperature in the San Antonio began a record breaking streak. That began on 5-16-22 with a record breaking triple digit temperature that day in May.

(40) In fact San Antonio metro Health officials reported on or about 5-19-22 that cases of heat related illnesses were at (60) sixty at the time. which was the highest number at anytime since 2018.

(41) As of 6-10-22 there had already been (10) ten days of triple digit high temperatures at San Antonio international airport.

(42) In 2022 the San Antonio metro area experienced a record breaking (16) sixteen days of triple digit temperatures in the month of June.

(43) July 2022 started with (13) thirteen consecutive days of triple digit temperatures at San Antonio International Airport

(44) All but (2) two days in July 2022 were in the triple digits as recorded at San Antonio International Airport

(45) July 2022 was the hottest July on record in San Antonio metro area.

## II. Statement of Claim

(46) The year 2022 was the second hottest summer in Texas on record.

(47) 2022 was the third hottest year on record with an average temperature of 73.6 degrees in the lower (48) forty eight states. Followed only by 1936 and 2021 where the average temperature for those years was (74) seventy four degrees.

(48) Each individual TDCJ unit record their outdoor apparent temperatures during the summer months

(49) Thus there are records for the apparent outdoor temperature at the Connally Unit for the times in question here.

(50) Pursuant to TDCJ policy and practice both former warden Rayford and current warden Cuetto of the Connally Unit reviews the apparent outdoor summer temperatures at the Connally Unit. Establishing that they both know about the apparent temperatures at the Connally Unit are dangerous, during the summer months of 2020, 2021 and 2022.

(51) Despite this warden Rayford and warden Cuetto have not ever looked into ways associated to cool even a single indoor housing area in the general population at the Connally Unit.

(52) Likewise, Executive Director Collier and Chairman Patrick L. O'Daniel are aware that apparent temperatures inside TDCJ prisons are hazardous during the summer. Especially for prisoners such as Calton with underlying medical conditions.

## V   Statement Of Claim

and medications to treat the same that make him more susceptible to heat related injuries and death. Even so, Director Collier, Chairman O'Daniel, TDCJ or The Texas Board of Criminal Justice or the Health Services Division took no steps to bring the dangerous temperatures down in any TDCJ facility with the exception of the Pack Unit.

(53) According to the National Weather Service [hereafter referred to as NWS], summer temperatures in the future will not be lower than temperatures from the past.

(54) In fact, temperatures will likely increase in the future. As established by the First Street Foundation's determination made on 9-6-22 in an analysis determining that the temperature will hit a 125 degree heat index due to global warming only getting hotter. Especially on the gulf coast. Due to most of the State of Texas is at sea level.

## (D)  The Extreme Temperatures At The Connally Unit Threaten Illness, Injury and Death During Summer Months

(55) Extreme Heat can injure or kill people. According to the NWS, "heat is the number on weather-related killer in the United States". Over a hundred people die from exposure to extreme heat each year, and thousands are injured. On average, heat kills more people in the United States each year than hurricanes, tornadoes, floods, or lightning combined.

(56) According to the NWS, The American medical Association,

# II  Statement of Claim

the Environmental Protection Agency [Hereafter refered to as EPA], and the Center for Disease Control and Prevention [Hereafter refered to as CDC], "maintaining a consistent internal body temperature, generally 98.6° Fahrenheit, is essential to normal physical functioning." Excessive heat can "stress the body's ability to maintain this ideal temperature. If individuals fail or are unable to take steps to remain cool and begin to experience increasing internal temperatures, they increase their risk of experiencing a range of potential adverse health outcomes."

(57) High temperature and humidity prevent the human body from regulating its temperature. When exposed to heat, the heart will beat faster to increase blood flow to the skin, in order to dissipate heat and keep the internal organs from overheating. As the blood circulates to the skin, excess heat escapes into the cooler air. With so much blood pumped to the skin, the body struggles to maintain its normal functions.

(58) Likewise, the body also cools itself through sweating. The body produces sweat, which evaporates to cool the body. But when the humidity is high, the sweat cannot evaporate, preventing the body from cooling. In addition, continued exposure to heat causes the body to lose water and become dehydrated. When the body loses enough water, it also loses oxygen.

(59) Thus, when exposed to high heat and humidity, the body cannot cool itself through sweating and circulation, the body's temperature rises, and heat related injuries may develope.

## II. Statement of Claim

(60)   Continued exposure to high heat and humidity can cause permanent injuries to the body, including heat stroke and death. High temperatures can also cause less deadly, but still painful, heat-related illnesses, including heat exhaustion and heat cramps.

(61)   Symptoms of heat exhaustion, according to the federal National Institute for Occupational Safety and Health [hereafter referred to as NIOSH], include fatigue; heavy sweating; nausea; dizziness; elevated body temperature; and fast, shallow breathing.

(62)   According to the Mayo Clinic and TDCJ's own training materials, heat exhaustion can quickly progress to heat stroke if the person does not cool down quickly.

(63)   Heat cramps can consist of "muscle pain or spasms usually in the abdomen, arms, or legs," according to NIOSH.

(64)   Heat cramps are extremely painful. Even TDCJ's own medical policy recognizes that pain from heat cramps "may be quite severe".

(65)   NIOSH describes heat stroke as "the most serious heat-related disorder," in which "the body temperature can rise to 106 degrees Fahrenheit or higher within 10 to 15 minutes." Symptoms often include hot, dry skin; hallucinations; chills; headaches; confusion; and slurred speech." Heat stroke can cause death or permanent disability if emergency treatment is not given." According

Section 1983 complaint page 38 of 72

## I  Statement Of Claim

to resources published online by the mayo Clinic, "in a period of hours, untreated heatstroke can cause damage to your brain, heart, kidneys and muscles."

(66) In extreme temperatures, heat-related illnesses can arise and exacerbate quickly to cause death. According to NIOSH, "the different forms of heat-related illness . . . increase in severity as heat strain increases. This allows for a quick, deadly progression from heat exhaustion to heat stroke."

(67) Indeed, even TDCJ's own medical policies and training materials recognize heat stroke is "a medical emergency," that "the onset is often sudden," and that "death may occur."

(68) TDCJ policy recognizes inmates with certain "underlying medical conditions . . . place them at increased risk", including: "Cardiovascular disease i.e. hypertension, cirrhosis of the liver, chronic obstructive pulmonary disease, asthma, cystic fibrosis, diabetes, psychiatric conditions, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction." Heat tolerance weakens, and the risk of heat-related illness increases, for people who suffer from these conditions. TDCJ policies and procedures recognize prisoners with these conditions are at greater risk of heat-related illness, injury, and death.

(69) Similarly, TDCJ's policies state the risk of heat-related illness increases for individuals who use "anticonvulsants, anticholinergics, antihistamines, antipsychotics, antidepressants

## V   Statement of Claim

beta blockers, and diuretics". Typically, these drugs impair the body's ability to cool itself. See Exhibit "B" hereto attached and incorporated

(70) These medications are used to treat a wide range of illnesses and disabilities common to prisoners at the Connally Unit, including hypertension, allergies, depression, and bipolar disorder.

(71) Calton is currently prescribed an anticonvulsant, an antihistamine, an antipsychotic, an antidepressant, a beta blocker and a diuretic.

(72) Each of Calton's currently prescribed medications noted above are recocognized by TDCJ's policies and procedures as medications that increase the risk of heat-related illness and death, and that these prisoners "should not be allowed to work or recreate in environments where the apparent temperature is 95 degrees or higher". Bryan Collier, Patrick L. O'Daniel, TDCJ and Texas Board Of Criminal Justice are aware and/or promulgated these policies.

(73) TDCJ also acknowledges people with the following medical conditions and disabilities are at a heightened risk of heat-related illness: obesity, diabetes, hypertension, cardiovascular disease, cirrhosis of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction.

Section 1983   Complaint page 40 of 72

## V  Statement Of Claim

(74) UTMB, the medical provider at the Connally Unit, has informed TDCJ of these dangers mentioned above.

(75) TDCJ identifies Calton among many other prisoners at the Connally Unit as having medical conditions that prohibit them from working in "extreme temperatures". Calton and these prisoners medical conditions place them at increased risk of heat-related illness, injury or death, or are pre-scribed the medications TDCJ identifies as putting people at increased risk of heat-related illness, injury, or death.

## (E)  Extreme Heat In Texas Prisons Is Deadly

(76) Since 1998 — TDCJ prisoners in facilities around Texas have died of hyperthermia, or heat stroke, as set forth in the table below.

(a) Archie White died 6-29-98 at age 48 at the Robertson Unit: Disabilitues Hypertension, Depression, Schizo-phrenia, Obese

(b) Anselmo Lopez died 7-14-98 at age 41 at the Eastham Unit: Disability Schizophrenia

(c) James Moore died 7-30-98 at age 47 at the Byrd Unit: Disability Hypertension, schizophrenia

(d) Charles Finke Jr. died 8-8-99 at age 38 the Huntsville Unit: Disability Depression

(e) Gary Gemma died 8-13-99 at age 35 at the Coffield Unit: Disability Unknown

Section 1983 complaint page 41 of 72

## IV  Statement of Claim

(f) Carl Green died 8-19-00 at age 44 at the Boyd unit.
Disabilities — Obesity, Cardiovascular disease.

(g) John Cardwell died 8-4-01 at age 39 at the Allred unit
Disability — Depression

(h) Darrell Wafer died 5-19-03 at age 40 at the McConnell unit
Disability — unknown

(i) Ricky Robertson died 7-16-04 at age 37 at the Darrington unit
Disabilities — Bipolar, Depression

(j) James Shriver died 8-8-07 at age 47 at the Byrd unit
Disabilities — Hypertension, psychiatric medication

(k) Dionicia Ribbles died 8-13-07 at age 54 at the Byrd unit
Disability — Psychiatric medication

(L) Douglas Hudson died 7-25-11 at age 62 at the Gurney unit
Disability — Hypertension

(m) Larry McCollum died 7-28-11 at age 58 at the Hutchins unit
Disabilities — Diabetes, Hypertension, obesity

(n) Thomas Meyers died 8-3-11 at age 46 at the Coffield unit
Disabilities — Hypertension, psychiatric medication

(o) Robert Webb died 8-4-11 at age 50 at the Hodge Unit
Disabilities - Developmental Disability + Psychiatric medication

(p) Alexander Togonidze died 8-8-11 at age 44 at the Michael unit
Disabilities — Diabetes, Psychiatric medication, Hypertension

(q) Charles Cook died 8-8-11 at age 53 at the Hodge Unit
Disabilities — Developmental Disability, Psychiatric medication

Section 1983 Complaint page 42 of 72

## I   Statement of Claim

(R) Michael Martone died 8-8-11 at age 57 at the Huntsville Unit : Disabilities- Psychiatric medication, Hypertension, Depression and obesity

(S) Kelly Marcus died 8-12-11 at age 36 at the Connally Unit Disabilities - obesity, Hypertension

(T) Kenneth James died 8-13-11 at age 52 at the Gurney Unit Disability - Hypertension

(U) Daniel Alvarado died 8-20-11 at age 44 at the Beto Unit Disabilities - HIV, Psychiatric medication

(V) Rodney Adams died 8-3-12 at age 45 at the Gurney Unit Disabilityes - Psychiatric medication, Depression

(W) Albert Hinojosa died 8-29-12 at age 44 Garza West Unit Disabilities - schizophrenia, Depression

[77] The aforementioned prisoners that died while in TDCJ custody shared certain characteristics. As TDCJ knew, they all suffered underlying medical conditions and heat-sensitive disabilities that put them at greater risk of heat stroke, including taking psychotropic drugs to treat a mental illness, suffering from diabetes or hypertension, or taking diuretics to treat hypertension.

[78] In a 2012 email, two of TDCJ's top physicians discussed how "the majority of heat-related deaths involve prescription drugs known to increase the risk."

[79] According to the World Health Organization [Hereafter referred

Section 1983 Complaint page 43 of 72

# II   Statement of Claim

to as WHO], "heat increases death rates from cardiovascular and respiratory disease by placing extra stress on an already stressed system." Similarly, NIOSH warns that there is substantial evidence that extreme heat is a risk factor for cardiovascular disease and death.

(80) It is not just the temperature but also the humidity that contributes to heat. The heat index is a measure of "apparent temperature," based on ambient temperature and humidity, which the NWS says closely approximates how air temperature is "felt" by the human body

(81) The NWS correlates heat index ranges to risk levels:

(a.) Caution: heat index 80-90°F - "Fatigue possible with prolonged exposure and/or physical activity."

(b.) Extreme Caution: heat index 91-104°F - "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

(c.) Danger: heat index 105-125°F - "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

(d.) Extreme Danger: heat index > 126°F - "Heatstroke likely."

(82) The NWS warns that exposure to heat index greater than 105°F "may cause increasingly severe heat disorders with continued exposure or physical activity

(83) TDCJ incorporates a version of the NWS chart into its policies

## II  Statement of Claim

and training materials, and is well aware of the facts de-
scribed by the NWS. That chart is included as an Ap-
pendix to the TDCJ policy entitled "Temperature Extremes
in the TDCJ workplace", dated November 10, 2008. The
policy and chart are made available to every TDCJ
warden, including Warden Rayford and Warden Cuette.

(84) Like the NWS chart, TDCJ's version recognizes that as
the heat index increases, the risk of increasingly severe heat-
related illnesses goes up. When the heat index exceeds 90
degrees. A typical occurrence inside the Connally unit during
the summer months i.e. May thru September. According
to TDCJ, "heat exhaustion" becomes "possible". Above 105
degrees, "heat stroke" becomes "possible". Above 130
degrees, heat stroke is "imminent" so says TDCJ.

(85) Importantly, the NWS and TDCJ charts are designed to
predict the risk to people who do not suffer from medical
conditions that increase their susceptibility to heat-related in-
juries. These charts predict the risk to "healthy" people.
Unlike Calton who has both physiological and psycholo-
gical infirmities and who is prescribed medications to treat
the same that causes an increased risk of heat-related illness,
injury and death.

(86) On or about 9-6-22 The First Street Foundation determined in
an analysis that temperature will hit a 125 degree heat index
in every county in the state of Texas. With temperatures in
the state due to global warming only getting hotter. Especially

section 1983 Complaint page 45 of 72

## V Statement Of Claim

on the gulf coast. Due to most of Texas is at sea level.

(87) Both the NWS and TDCJ charts show that prisoners
living in the Connally unit are exposed to indoor
heat indexes that put them at risk of heat exhaustion
and heat cramps virtually every day of the summer.

(88) Though TDCJ's policies recognize that escalating extreme tempera-
tures put prisoners at increased danger, TDCJ policies do
nothing to provide Calton and other similarly situated pri-
soners additional protections who are housed in the gene-
ral population housing buildings at the Connally unit when
apparent temperatures go up during may thru September.

(89) TDCJ has no policy to lower indoor apparent tempera-
tures at the Connally unit in general population housing areas

(90) No mitigation measures short of climate control or a
policy to re-locate Calton and other similar situated prisoners
to cooler housing areas to protect them from these extreme
temperatures. So long as general population housing areas
on the Connally unit are dangerously hot, Calton and other
similarly situated prisoners will inevitably suffer heat-related
illnesses, injuries, and be placed at increased risk of death

(91) Dr. Charles Adams M.D., the medical director supervising medical
care provided at multiple TDCJ prisons, stated what
should be obvious to anyone: "they need cooling".

section 1983 Complaint page 46 of 72

## II Statement of Claim

(92) TDCJ ignored Dr. Charles Adams observation, and still have not provided "any cooling" at the Connally Unit in the general population buildings.

(93) While TDCJ knows and ignores the hazards to Calton and other similar situated prisoners housed in general population at the Connally Unit. TDCJ officials including the former executive director, Brad Livingston approved installing climate controlled hog barns to protect the welfare of TDCJ's agricultural products.

(94) TDCJ's detailed policies require that pigs live in a "comfortable environment with ventilation. Animals shall never be handled or housed in a manner that does not provide these essentials." Misters begin to cool the pigs when the temperature goes above 74 degrees to keep the pigs "comfortable".

(95) TDCJ policy requires temperatures be kept no higher than 85 degrees to ensure "pig comfort". TDCJ policies even establish an "upper critical limit" for pigs at 95 degrees because temperatures above 95, according to TDCJ policies, negatively affect pigs' "health", and some form of cooling" is required above this "critical limit".

(96) High ranking TDCJ officials even told press these climate-controlled barns were necessary to protect vulnerable pigs from heat stroke. TDCJ has no effective similar policies to protect Calton and similar situated prisoners. Who all continue to suffer during summer months while housed in the general

Section 1983 Complaint   page 47 of 72

# V  Statement Of Claim

(101) Hypertension itself also increases a patient's susceptibility to heat stress, and combined with extreme heat, diminishes the body's ability to regulate internal temperature. Thus a patient with hypertension will be at additional risk of heat-related injuries, and suffer additional pain and punishment above and beyond what an able-bodied inmate at the Connally Unit experiences.

(102) TDCJ is aware that hypertension increases patient's risk of heat-related illness.

(103) There are many prisoners at the Connally unit who suffer from hypertension.

## (ii)  Asthma

(104) Asthma is a chronic lung disease that inflames and narrows the airways. It substantially limits sufferers' ability to breathe, causing recurring periods of wheezing, chest tightness, shortness of breath, and coughing. Asthma also substantially limits the operation of the respiratory system.

(105) Heat and humid air can trigger asthma symptoms, causing asthma patients to suffer more pain and punishment in hot environments than people without asthma.

(106) TDCJ's medical provider recognizes that asthma is a condition that places patients at increased risk of heat-related illnesses.

(107) TDCJ is aware that asthma places patients at increased

Section 1983 Complaint page 49 of 92

## IV   Statement Of Claim

risk of heat-related illness.

(108)  There are many prisoners at the Connally Unit who suffer from asthma.

### (iii) Diabetes

(109)  Diabetes is a chronic disease caused by an insulin imbalance. Insulin is a hormone produced by the pancreas to control blood sugar. Diabetes results from Improper insulin levels. Diabetes is a physical condition effecting the endocrine, digestive, circulatory, and nervous systems.

(110)  Diabetes impairs the body's ability to adjust to increases in temperatures by affecting diabetics' ability to sweat. Sweating is critical to cool the body in extreme heat. An inability to sweat increases the body's core temperature, profoundly aggravating the risk of heat stroke.

(111)  Diabetes also reduces blood circulation by impairing the action of the heart and decreasing the ability of the body to dilate the blood vessels at the skin. Both are essential to dissipate body heat, and prevent heat stroke.

(112)  TDCJ is aware that diabetes increases the risk of heat-related illness.

(113)  There are many prisoners at the Connally Unit who suffer from diabetes

### (iv) Chronic Obstructive Pulmonary Disease (COPD)

(114)  COPD is a disease that makes it difficult to breath

section 1983 complaint page 50 of 72

## V   Statement Of Claim

It includes chronic bronchitis and emphysema.

(115) COPD causes frequent coughing, shortness of breath, and tightness in the chest, among other symptoms

(116) COPD impairs the operation of the respiratory, circulatory, and cardiovascular systems.

(117) Heat exacerbates COPD, because the body needs to breathe in additional oxygen to help cope with the heat. This requires additional breathing, which is impaired by COPD.

(118) TDCJ is aware that COPD increases the risk of heat-related illness,

(119) There are many prisoners at the Connally Unit who suffer from COPD.

### (V)  Schizoaffective Disorder

(120) Schizoaffective disorder is a chronic mental illness in which a person suffers from both symptoms of schizophrenia and a mood disorder such as major depression or bipolar disorder. Symptoms include paranoia, delusions, hallucination, severe depression, mania, and thoughts of suicide.

(121) Schizoaffective disorder requires treatment with psychotropic drugs.

(122) Schizoaffective disorder impairs the operation of the brain

(123) Schizoaffective disorder limits patients ability to think, concentrate, work, care for themselves, see, hear and sleep.

Section 1983 complaint page 51 of 72

## V  Statement Of Claim

(124) According to TDCJ's medical policies, psychotropic drugs, increase a patient's vulnerability to heat-related medical conditions, like heat exhaustion, and heat stroke.

(125) TDCJ is aware that schizoaffective disorder and medications used to treat it increase the risk of heat-related illness

(126) There are many prisoners at the Connally unit who suffer from a schizoaffective disorder and take some type of psychotropic drug.

### (Vi)  Major Depression

(127) Major depression is a chronic mental illness caused by a serotonin imbalance in the brain. People with depression experience insomnia or excessive sleeping, loss of appetite, fatigue, feelings of worthlessness, irritability, persistent headaches, and problems concentrating.

(128) Depression is physiological condition affecting body systems, including the brain.

(129) It was alleged in other litigation that the doctor treating patients at the Pack unit testified patients with depression may experience difficulty caring for themselves. TDCJ does not dispute this. See Cole v Collier Civil Action No. 4:14-CV-1498 Houston Division. Third Amended Complaint at page 36 Ln. 205.

(130) It was additionally alleged by TDCJ's medical provider identifies antidepressant medications, like Prozac, as putting patients at much higher risk of heat-related illness.

section  1983 Complaint page 52 of 72

## V Statement Of Claim

In fact there, it was alleged that when a patient is prescribed an antidepressant, the physician informs the patient that these medications "can affect the manner in which the body relates to excessive heat especially in the summer." The patient is told to "contact nursing/security if they feel dizzy, confused, or over heated" so their vital signs can be checked. The patient is warned "excessive heat can cause life-threatening conditions" and told to "drink plenty of water when the heat is extreme". Despite this explicit warning, TDCJ does nothing to protect inmates taking such medications from the extreme temperatures inside the housing areas.

(131) TDCJ is aware that depression and the medications used to treat it increase the risk of heat-related illness.

## The Wheelchair Facts

(132) In 2012 TDCJ security officers utilized excessive force against Calton on the Michael Unit.

(133) During this use of excessive force Calton's right hip was injured by TDCJ security correctional officials.

(134) Calton's right hip injury has progressively grown worse since 2012.

(135) For example in 2015 Calton's hip started popping as though it was about to pop out of place.

(136) By 2017 Calton began to limp from this right hip injury due to pain.

Section 1983 Complant page 53 of 72

# IV  Statement of Claim

(137)  Between 2017 up until 2022 the pain in Calton's right hip continued to grow worse and worse and Calton's limp became more prominent, noticeable and worse.

(138)  By 2022 Calton began to experience severe pain with each step he takes with his right leg. With every step he takes with his right leg Calton feels severe pain in his right hip.

(139)  Calton's pain became so severe that on 4-6-22 he was prescribed two crutches by provider Joseph C. Obi in lieu of the wheelchair Calton requested that day.

(140)  Although the crutches did help Calton walk without being in such severe pain sans the crutches. Calton no less experienced pain with each step he took with his right leg in his right hip area even with the aide of crutches.

(141)  This pain Calton experienced in his right hip would still become severe and nearly unbearable after long walks from his housing area. To areas such as the dining hall, law library, infirmary and mailroom at the prison.

(142)  Even with crutches to assist him to walk on long walks Calton would still experience pain and the pain would grow worse with each step taken.

(143)  Provider Joseph C. Obi informed Calton that he knew with movement of my right hip would cause me pain in light of the injuries to Calton's right hip as verified by X-Rays. And that a wheelchair would eliminate such movement of the right hip. However due to budget restraints provider Joseph C. Obi

## II  Statement of Claim

informed Calton that a wheelchair could not be provided to Calton at the time. Because TDCJ only has a certain amount wheel chairs available. And when one becomes available that is currently being used be another prisoner. I would be prescribed a wheelchair.

(144) On 10-5-22 Calton explained to provider Cyril C. onyemaechi how Calton would experience severe pain with each step that Calton took with his right leg in his right hip. Calton explained this was so even with the aide of crutches while walking.

(145) Calton further explained to provider Cyril C. onyeamaechi that on such long walks Calton would have to take daily to the dining hall three times a day, the law library, infirmary and mailroom. The pain Calton would experience on these long walks was severe and would be unbearable at the end of these long treks of hundreds of yards.

(146) Provider Cyril C. onyemaechi informed Calton that he knew after reviewing Calton X-Rays and other medical records memorializing Calton's Right hip injury. That Calton would experience severe pain while walking even with the aide of crutches. Due to bone on bone arthritis in calton's right hip.

(147) After being informed of provider Cyril C. onyemaechi understanding of Calton's pain on 10-5-22. Calton requested to him for him to prescribe Calton a wheelchair.

(148) calton then explained to provider Cyril C. onyemaechi that corrective hip surgery was not an option and that Calton would not consent to surgery. Hence his wheelchair request

## II Statement of Claim

(149)   Provider Cyril C. Onyemaechi then informed Calton that he would prescribe Calton a wheelchair. However the final decision on whether Calton would be provided the prescribed wheelchair would be made by Dr. Tupa the Connally unit medical director.

(150)  With full knowledge of Calton's complaint of severe pain experienced while walking with crutches in every step he takes. And after having reviewed Calton's medical records concerning Calton's right hip. Dr. Tupa denied Calton the wheelchair previously prescribed by Provider Cyril C. Onyemaechi on 10-5-22.

(151)  Calton's request for a wheelchair if honored would eliminate him from having to experience severe pain and eliminate further wear and tear on Calton's right hip joint that is already bone on bone.

## Class Action

(152)  Pursuant to Federal Rule Of Civil Procedure 23(a) and (b)(2), Calton bring this action on behalf of himself and similarly situated persons.

(153)  Calton proposes to represent a class composed of all inmates who currently are, or who in the future will be, incarcerated at the Connally unit, and who are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the general population housing areas. Calton is typical of class members.

(154)  Calton also seek to represent the following sub-classes of people who (a) are currently incarcerated at the Connally unit or will be in the future, (b) are subjected to TDCJ's policy and practice of failing to regulate high apparent indoor temperatures in the housing areas, and either:

## IV Statement Of Claim

Heat-sensitive Subclass: (i) have a physiological condition that places them at increased risk of heat-related illness, injury, or death including, but not limited to suffering from obesity, diabetes, hypertension, cardiovascular disease, psychiatric conditions, cirrhoses of the liver, chronic obstructive pulmonary disease, cystic fibrosis, asthma, Sjogren's syndrome, sweat gland dysfunction, and thyroid dysfunction; or, (ii) are prescribed an anticonvulsant, anticholinergic, antipsychotics, antihistamines, antidepressants, beta blockers, or diuretic; or, (iii) are over age 65. Calton is a typical member of this subclass with the exception of being over 65.

Disability Subclass: suffer from a disability that substantially limits one or more of their major life activities and who are at increased risk of heat-related illness, injury, or death due to their disability or any medical treatment necessary to treat their disability. Calton is a typical member of this subclass.

(155) Numerosity: The joinder of each class member would be impractible because each class is so numerous. The approximate number of class members exceeds 1,400 as the Connally Unit currently houses over 1,400 inmates and many other other inmates could potentially be housed at the Connally Unit during some point during this litigation, or in the future. Joining all members of the class is impracticable due to the minimum approximate 1,400 person size and the fluctuating population of the Connally Unit.

(156) The subclasses are also sufficiently numerous to satisfy Rule 23(a). Because many prisoners incarcerated at the Connally Unit

Section 1983 Complaint page 57 of 72

## IV Statement of Claim

housed in general population suffer from at least one medical condition or disability that would make them a class member. Many of which have been identified by TDCJ as having "heat restrictions" on their forced labor assignments due to their vulnerability to 4 extreme temperatures. Likewise upon reasonable belief, TDCJ houses a high number of inmates with qualifying disabilities at the Connally unit.

(157) There are many prisoners on the Connally unit housed in general population housing who are over the age of 65. Joining all of these prisoners would be impracticable.

(158) Identifying every inmate at the Connally unit who is a subclass member would require interviewing hundreds of prisoners, and reviewing each of their medical records. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the parties and the court.

(159) Commonality : Common question of law and fact exist as to all members of the class and predominate over any questions solely affecting individual members of the class.

(A) The Common questions of law and fact for the proposed General class are:

(a) Are all prisoners at the Connally unit housed in general population housing are exposed to high apparent temperatures inside their housing areas?

(b) Does exposing prisoners to the high apparent temperatures in the general population housing areas at the Connally unit violate the Eighth Amendment, by denying prisoners safe

Section 1983 Complaint page 58 of 72

## V   Statement Of Claim

housing and shelter from the elements?

(C) Are the members of the General Class entitled to declaratory and injunctive relief?

(B)   Further, the common questions of law and fact for the Subclasses are:

(i)   For the Heat-Sensitive Subclass:

(a) Is the risk of heat-related injuries for the Heat-Sensitive Subclass increased when members are exposed to the high apparent temperatures in the general population housing areas on the Connally Unit?

(b) Does exposing members of the Heat-Sensitive Subclass to the high apparent temperatures in the general population housing areas at the Connally Unit violate their Eighth Amendment rights to safe housing conditions and shelter from the elements?

(C) Are the members of the Heat-Sensitive Subclass entitled to declaratory and injunctive relief?

(ii)   For the Disability Subclass:

(a) Do the members of the Disability Subclass (1) suffer from a disability that substantially limits one or more of their major life activities and (2) either suffer from a disability that increases the risk of heat-related illness, injury or death?

(b) Does TDCJ provide reasonable accommodations to pri-

Section 1983 Complaint page 59 of 72

## II Statement of Claim

Soners with heat-related disabilities exposed to high apparent temperatures in the housing areas at the Connally Unit in general population housing?

(c) Are Defendants immune from claims for injunctive and declaratory relief brought under 42 U.S.C § 1983?

(d) Are members of the Disability Subclass entitled to declaratory and injunctive relief?

(160) **Typicality:** Calton's claims are typical and representative of each class and subclass member's claims against Defendants, as identified above. The claims of Calton and the class all arise from the same conduct by Defendants exposing them to unsafe temperatures in the general population housing areas at the Connally Unit, are based not only on identical legal theories, and also seek identical remedies injunctive and declaratory relief requiring Defendants to lower the temperatures at the Connally Unit to safe levels. The Connally Unit general population housing areas i.e. Three Building, Four Building, Seven Building, Eight Building, Eighteen Dorm and Nineteen Dorm all reach roughly the same temperature levels; the high indoor apparent temperatures threaten all inmates' wellbeing. Calton's interest in reducing the danger of heat-related illness, injury, or death is identical to every other inmate's interest. All members of the class are similarly injured by Defendants' wrongful conduct.

(161) **Adequacy of Class Counsel:** Calton and the appoint-

Section 1983 Complaint   page 60 of 72

## XI   Statement Of Claim

ment counsel will fairly and adequately represent the interests of the class. Calton has no interests contrary to those of class members.

(162)  A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, especially since joinder of all class members is impracticable. Each class member is irreparably harmed as a result of Defendants' wrongful conduct. Litigating this case as a class action will reduce the risk of repetitious litigation relating to the Defendants' conduct

(163)  Calton does not seek damages, except as may be incidental to declaratory or injunctive relief.

### Causes Of Action

### I. Eighth and Fourteenth Amendment: Conditions Of Confinement

Against Defendants Bryan Collier, Patrick L. O'Daniel, oscar Mendoza, Alphonso Rayford and Warden Cuetto in their Official Capacity and Individual Capacity

(164)  Calton incorporates the previous paragraphs as if alleged herein, and further plead:

(165)  Pursuant to 42 USC §1983, Collier, O'Daniel, Mendoza, Rayford and Cuetto, in their official and individual capacities, are deliberately indifferent to the substantial risk of serious harm to prisoners at the Connally Unit caused by their choice to expose prisoners to high ap-

Section 1983 Complaint page 61 of 72

## II  Statement Of Claim

parent temperatures inside the general population housing areas and unnecessarily and wantonly cause them pain.

(166) The high indoor apparent temperatures at the Connally Unit general population housing areas pose an unreasonable risk to prisoners' health.

(167) Defendants are aware that extreme heat in the Connally Unit general population housing areas poses substantial risk of serious injury to inmates, including Calton. Defendant's knowledge is demonstrated by TDCJ policies and practices as well as the well-documented history of injuries to inmates and employees in TDCJ generally and particular at the Connally Unit general population housing areas. Defendants remain indifferent to the risk, failing to take obvious steps to mitigate it.

(168) In light of the numerous public warnings about the risk posed by extreme temperatures from government agencies, scientific studies of the risk, warnings within TDCJ's own policy, knowledge of TDCJ's medical providers, and the history of inmate and staff injuries, Defendants know of the risk of heat-related illness, or death that exists at the Connally Unit general population housing areas.

(169) Defendants are acting with deliberate indifference to Calton and other similarly situated prisoners' constitutional right to be free from cruel and unusual punishment by refusing to provide safe housing areas that inmates from exposure to extreme heat, and which annually cause injuries to prisoners.

(170) Defendants' deliberate indifference Calton and other similarly

## V   Statement of Claim

Situated prisoners risk of serious medical problems puts then all at substantial risk of serious bodily injury including, but not limited to, heat stroke, heat cramps, and heat, and which annually causes injuries to prisoners.

(171) Defendants policies, practices, acts and omissions violate the cruel and unusual Punishments Clause of the Eighth Amendments, made applicable to the states through the Fourteenth Amendment to the United States Constitution.

(172) As a proximate result of Defendants' unconstitutional policies, practices, acts, and omissions, Calton and class members have suffered and will continue to suffer immediate and irreparable injury, including physical injury, risk of physical injury, and risk of death.

## II   Eighth and Fourteenth Amendment: Denial of medical Care

Against Defendants Bryan Collier, Patrick L. O'Daniel, Oscar Mendoza, Alphonso Rayford and Warden Cuetto in their official Capacity and Individual Capacity.

(173) Calton incorporates the previous paragraphs as if alleged herein, and further plead: In particular paragraphs 1-131

(174) Pursuant to 42 USCS 1983, Collier, O'Daniel, Mendoza, Rayford and Cuetto, in their official and individual capacities, are deliberately indifferent to the substantial risk of serious harm to Calton's right hip and the continued infliction of severe pain Calton must endure with each step he takes. Due to defendants do not have a sufficient amount of wheelchairs

## II  Statement Of Claim

to provide offenders in need of them.

(175) the lack of a sufficient amount of wheelchairs has resulted in Catton to have to endure unwarranted severe pain with each step he takes.

(176) Defendants are aware that the lack of a sufficient amount of wheelchairs would result in some prisoners being denied and deprived of a wheelchair. with the deprivation being unrelated to medical reasons or a medical decision. Defendants remain indifferent to the pain Catton must endure without being provided a wheelchair.

(177) Defendants are acting with deliberate indifference to Catton's constitutional right to be free from cruel and unusual punishment by refusing to provide him a wheelchair.

(178) Defendant's acts and/or omissions violate the cruel and unusual punishment clause of the eighth Amendments, made applicable to the states through the Fourteenth Amendment to the U.S. Constitution.

(179) As a proximate result of Defendant's unconstitutional acts and/or omissions Catton will continue to suffer undue severe pain, and suffer immediate and irreparable injury, including physical injury and/or the risk of further injury.

## III  Eighth and Fourteenth Amendment: Denial Of medical Care

Against Defendant Cyril C. Onyemaechi in his official and Individual Capacity

(180) Catton incorporates the previous paragraphs as if alleged herein and further pleads: In particular paragraphs 132-151.

Section 1983 Complaint page 64 of 72

## II   Statement Of Claim

(181) Pursuant to 42 U.S.C. § 1983, medical Director Dr. Tupa, in his official and individual capacities, is deliberately indifferent to the substantial risk of serious harm to Calton's right hip and the continued infliction of severe pain Calton must endure with each step he takes. Due to defendant's failure to approve the previously prescribed wheelchair to Calton by providers.

(182) The failure of Dr. Tupa to approve the previously prescribed wheelchair to Calton has resulted in him to have to endure unwanton severe pain with each step he takes while walking

(183) Defendant Dr. Tupa after reviewing Calton's complaints and medical records was aware that his failure to approve the prescribed wheelchair to Calton would result in Calton to endure severe pain in his right hip. Dr. Tupa remains indifferent to the severe pain Calton must endure without wheelchair being approved by Dr. Tupa. Previously prescribed by providers.

(184) Dr. Tupa is acting with deliberate to Calton's constitutional right to be free from cruel and unusual punishment be refusing to approve the previously prescribed wheelchair to Calton.

(185) Dr. Tupa's acts and/or omissions violate the cruel and unusual punishment clause of the Eighth Amendments, made applicable to the states through the Fourteenth Amendment to the U.S. Constitution.

(186) As a proximate result of Dr. Tupa's unconstitutional acts and/or omissions Calton will continue to suffer under severe pain, and suffer immediate and irreparable injury, including physical injury and/or the risk of further injury.

Section 1983 Complaint page 65 of 72

# VI Relief

## Injunctive And Declaratory Relief

### I Eighth and Fourteenth Amendment: Conditions of Confinement

(187) Calton and other similar situated prisoners seek injunctive and declaratory relief pursuant to 42 U.S.C § 1983, for himself and the class, to require TDCJ to provide safe housing conditions in the Connally Unit general population housing areas.

(188) without permanent injunctive relief, Defendants will continue their same perilous practices and conduct, disregarding federal legal mandates, and endangering the lives and the welfare of current and future prisoners at the Connally Unit housed in the general population housing areas. Causing every prisoner housed therein to suffer each summer.

(189) Calton and similarly situated prisoners have no plan, adequate or complete remedy at law to address the wrongs described herein.

(190) Calton and similarly situated prisoners ask that the Court enjoin Defendants to maintain a safe indoor apparent temperature e.g. maintaining a heat index of 88 degrees or lower inside each of the Connally units generally population housing areas i.e. Nineteen and Eighteen dorms and Eight, Seven, Four and Three Buildings calculated using NWS heat index table, or enter other injunctive relief

Section 1983 Complaint page 66 of 72

## VI Relief

sufficient to protect the health and safety of the prisoners at the Connally unit housed in general population housing areas.

(191) Calton and other similarly situated prisoners request an order declaring the conditions under which they are housed are unconstitutional

(192) Calton and members of the class are entitled to injunctive and declaratory relief to end this unlawful discrimination.

(193) Calton and members of the class do not seek damages in reference to the conditions of confinement claims.

## II Eighth and Fourteenth Amendment: Denial of medical care

(194) Calton seeks injunctive and declaratory relief pursuant to 42 USCS 1983, to require TDCJ and Defendants Collier, O'Daniel, Mendoza, Rayford and Cuetto to purchase Calton of wheelchair.

(195) Calton further seeks injunctive and declaratory relief pursuant to 42 USC. §1983, to require defendant Dr. Tupa to approve the wheelchair previously prescribed to Calton by providers.

(196) without permanent injunctive relief, the aforementioned defendants will continue their same perilous acts and/or omissions, that deprives Calton a wheel chair, disregarding federal legal mandates, and in turn allowing Calton to continue to suffer from severe pain with each step he takes.

(197) Calton has no plain, adequate or complete remedy at

Section 1983 Complaint page 67 of 72

## VI Relief

law to address the wrongs described herein.

(198) Calton asks that the Court enjoin defendants TDCJ, Collier, O'Daniel, Mendoza, Rayford and Cuetto to purchase Calton a wheelchair and that Defendant Dr. Tupa approve the wheelchair providers previously prescribed to Calton or enter other injunctive relief to ensure Calton is provided a wheelchair to end his unwanton severe pain must bear with each step he takes while walking.

(199) Calton requests an order declaring the deprivation of a wheelchair to Calton resulting in severe pain to Calton with each step he takes while walking is unconstitutional.

(200) Calton seeks damages in reference to the Denial of medical care claim i.e. deprivation of wheelchair resulting in severe pain with each step Calton takes while walking as described below.

## Compensatory Damages

(201) Calton seeks compensatory damages in the amount of 100,000.00 individually and severely against defendants TDCJ, Collier, O'Daniel, Mendoza, Rayford.

(202) Calton seeks compensatory Damages in the amount of 100,000.00 against defendant Dr. Tupa

## Attorney's Fees

(203) Pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205

Section 1983 Complaint page 68 of 72

## VI   Relief

Calton and the Class are entitled to recover attorney's fees, litigation expenses, and court costs, including expert costs limited to the Conditions Of Confinement Claim.

## Prayer For Relief

Therefore, Calton respectfully request that the Court award the following relief:

(A) Certify this action as a class action, as described above For The Condition of Confinement Claim

(B) Remedy ongoing violations of law and the Constitution by granting declaratory and injunctive relief, as set out herein, on behalf of Calton, and the class For The condition of Confinement Claim

(C.) Permanently enjoin Defendants to abate the risk of serious harm described above by taking steps including, but not limited to, maintaining a heat index of 88 degrees or lower inside the Connally Unit general population housing areas calculated using the NWS heat index table);

(D) Find that Calton and the Class are the prevailing parties in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses For the Condition of Confinement Claim

(E) Permanently enjoin Defendants to take the necessary steps to ensure Calton is provided and prescribed a wheelchair.

Section 1983 Complaint page 69 of 72

## VI   Relief

(F)   Grant such other and further relief as appears rea-sonable and Just, to which Calton and the Class may be entitled, separately or collectively For The Condition of Confinement Claim

(G)   Grant such other and further relief as appears reasonable and Just to which Calton may be entitled For the Denial of medical Care Claim. Including but not limited to the award of compensatory damages as described above and court costs and if needed expert fees.

Section 1983 Complaint page 70 of 72

## Sanction Information

#1

(1) Court that imposed warning of sanctions: U.S. District Court, Northern District of Texas Fort Worth Division

(2) Case Number: 4:13-CV-885

(3) Approximate date warning were imposed: Fall of 2013

#2

(1) Court that imposed warning of sanctions

(2) Case Number: U.S.C.A. No. 19-11206

(3) Approximate date warning were impose: 11-26-19

#1

(1) Sanction imposed by: U.S District Court, Northern District of Texas, Fort Worth Division

(2) Case Number: 4:14-CV-139

(3) Approximate date of Sanction: Spring of 2014

(4) $100.00 Sanction was paid in 2017

#2

(1) Sanction imposed by: U.S Court of Appeals, Fifth Circuit

(2) Case Number: No. 21-10295

(3) Approximate date of sanction: 4-26-21

(4) $100.00 Sanction was paid summer 2021

Section 1983 Complaint page 71 of 72

4. Have the sanctions been lifted or otherwise satisfied?   √ YES ___ NO

C. Has any court ever warned or notified you that sanctions could be imposed?   √ YES ___ NO

D. If your answer is "yes," give the following information for every lawsuit in which a warning was issued. (If more than one, use another piece of paper and answer the same questions.)

1. Court that issued warning (if federal, give the district and division): _See Attached p.7|_

2. Case number:_____

3. Approximate date warning was issued:_____

Executed on: _2-14-23_
DATE

_Allen "F" Calton_

_allen "F" Calton_
(Signature of Plaintiff)

## PLAINTIFF'S DECLARATIONS

1. I declare under penalty of perjury all facts presented in this complaint and attachments thereto are true and correct. And are based upon personal Knowledge

2. I understand, if I am released or transferred, it is my responsibility to keep the court informed of my current mailing address and failure to do so may result in the dismissal of this lawsuit.

3. I understand I must exhaust all available administrative remedies prior to filing this lawsuit.

4. I understand I am prohibited from bringing an *in forma pauperis* lawsuit if I have brought three or more civil actions or appeals (from a judgment in a civil action) in a court of the United States while incarcerated or detained in any facility, which lawsuits were dismissed on the ground they were frivolous, malicious, or failed to state a claim upon which relief may be granted, unless I am under imminent danger of serious physical injury.

5. I understand even if I am allowed to proceed without prepayment of costs, I am responsible for the entire filing fee and costs assessed by the court, which shall be deducted in accordance with the law from my inmate trust account by my custodian until the filing fee is paid.

Signed this _14th_ day of _February_, 20 _23_.
(Day)        (month)        (year)

_Allen "F" Calton_

_allen "F" Calton_
(Signature of Plaintiff)

**WARNING: Plaintiff is advised any false or deliberately misleading information provided in response to the above questions may result in the imposition of sanctions. The sanctions the court may impose include, but are not limited to, monetary sanctions and the dismissal of this action with prejudice.**

Section 1983 Complaint page 72 of 72

5

## Current Patient Restrictions

**Patient: CALTON,ALLEN F   MRN: 1123880   DOB: 10/02/1967   Sex: MALE   Race:BLACK**

| Order Provider | Section | Element | Restriction | Start Date | # Days | Exp. Date | Cont | Data | Units |
|---|---|---|---|---|---|---|---|---|---|
| UNKNOWN, UNKNOWN | II | Bunk Assignment | Lower Only | 07/10/2015 | | | Yes | | |
| UNKNOWN, UNKNOWN | II | Extended Medical Hours | Medical Non-KOP | 07/10/2015 | | | Yes | | |
| UNKNOWN, UNKNOWN | II | Extended Medical Hours | Psych Non-KOP | 07/10/2015 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 12. No Climbing | 01/02/2014 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 16. No Repetitive Use of Hands | 01/02/2014 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 19a. Medical - No Work in Direct Sunlight | 01/02/2014 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 19b. Psych - No Work in Direct Sunlight | 01/02/2014 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 20a. Medical - No Temperature Extremes | 01/02/2014 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 20b. Psych - No Temperature Extremes | 01/02/2014 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 21a. Medical - No Humidity Extremes | 01/02/2014 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 21b. Psych - No Humidity Extremes | 01/02/2014 | | | Yes | | |
| UNKNOWN, UNKNOWN | III | | 9. No Lifting > | 01/02/2014 | | | Yes | 20 | Lbs |

Exhibit "A" page 1 of 1

*PLEASE NOTE:  HSM-18 in the mainframe will be updated from these orders hourly from 6AM to 5PM.*

**High Risk Medications:**
    1) Anhidrotics: drugs that inhibit perspiration
    2) Poikilothermics: drugs that disrupt the body's normal temperature regulating mechanisms
    3) Potentiators: drugs that potentiate the effects of anhidrotics or poikilothermics
    4) Photosensitizers: drugs that increase the risk of sunburn when exposed to sunlight

**Anhidrotic Medications:**
    1) Anticonvulsants:
        —            Topiramate (Topamax®)              —
    2) Anticholinergics:
        Benztropine (Cogentin®)              Hyoscyamine (Levbid®)
        Oxybutynin (Ditropan®)              Trihexyphenidyl (Artane®)

**Antidepressants:**
                Nortriptyline (Pamelor®)

**Poikilothermic Medications:**
    1) Antihistamines:
        Cyproheptadine (Periactin®)       Diphenhydramine (Benadryl®)
        Hydroxyzine (Atarax®)             Promethazine (Phenergan®)
    2) ALL antipsychotic medications
    3) Beta blockers:
        Atenolol (Tenormin®)*       Metoprolol (Lopressor®)*       Propranolol (Inderal®)*
    4) Diuretics:
        Furosemide (Lasix®)*       Hydrochlorothiazide (Hydrodiuril®)*

**Photosensitizing Medications:**
    1) Cardiovascular:
                Amiodarone (Pacerone®)
    2) Antimicrobials:
        Quinolone antibiotics       Sulfonamide antibiotics       Tetracycline antibiotics
    3) Antipsychotics:
        Phenothiazines              Risperidone (Risperdal®)       Ziprasidone (Geodon®)
    4) Hypoglycemics:
        Glipizide (Glucotrol®)      Glyburide (Diabeta®)          Glimepiride (Amaryl®)
    5) Antineoplastics:
                Dacarbazine                     Methotrexate
    6) Anticonvulsants:
                Lamotrigine (Lamictal®)
    7) Diuretics:
                Hydrochlorothiazide (Hydrodiuril®)
    8) Miscellaneous:
        Isotretinoin (Accutane®)    Tretinoin (Retin-A®)         Tacrolimus (Prograf®)
        Sulfasalazine (Azulfidine®)

Exhibit "B" page 1 of 1

3



**Texas Department of Criminal Justice**

# STEP 2

**OFFENDER GRIEVANCE FORM**

| OFFICE USE ONLY | |
|---|---|
| Grievance #: | 2022143900 |
| UGI Recd Date: | NOV 2 1 2022 |
| HQ Recd Date: | NOV 2 8 2022 |
| Date Due: | 1/5/23 |
| Grievance Code: | 035 |
| Investigator ID#: | 10352 |
| Extension Date: | |

Offender Name: Allen "F" Calton    TDCJ # 1123880

Unit: Connally    Housing Assignment: 3C 5B

Unit where incident occurred: Connally Unit    3A·56B

---

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

---

Give reason for appeal (Be Specific).    *I am dissatisfied with the response at Step 1 because...*

I am filing this Step 2 because I am experiencing alot of pain while walking with each step I take. And prison officials know this and have yet to provide me a wheel chair

---

**I-128 Front (Revised 11-2010)**        **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**        **(OVER)**

**Appendix G**

_____

_____

_____

_____

_____

Offender Signature: _____Allen "F" Calton_____   Date: ___11-18-22___

**Grievance Response:**

A review of the Step 1 medical grievance has been completed regarding your complaints of being denied use of a wheelchair. You stated you have severe hip pain. You said the provider stated you would be given a wheelchair when the budget allowed for purchase, or one becomes available. You said you have to use crutches to walk, which causes your pain to become worse. You also said you need surgery to correct your hip from a Use of Force in 2012. You asked to have a wheelchair provided.

Review of the electronic health record indicated you completed your annual physical examination on 10/5/2022. At that time, the provider documented you ambulated with a single crutch. No change was indicated to your treatment care plan regarding ambulation aides. You refused referrals to Hospital Galveston (HG) for elevated laboratory results.

All medications, treatments, and referrals are based on the clinical findings of the provider at the time of their assessment. While you maintain the right to refuse any services offered, you do not have the liberty to dictate what medications, treatments, or appointments will be prescribed. Wheelchair authorization is not dependent on budgetary cost factors. Per the Offender Orientation Handbook, you have 15 days from the date of the incident of your complaint to file your Informal Resolution Attempt. Please refer to the Offender Orientation Handbook for the correct process to file a formal complaint. If you have questions regarding this process, you should contact your Unit Grievance Officer for assistance in filing your complaint correctly. No further investigation is warranted at this time.

**STEP II MEDICAL GRIEVANCE PROGRAM**
**OFFICE OF PROFESSIONAL STANDARDS**                                        **12/28/2022**
**TDCJ HEALTH SERVICES DIVISION**
Signature Authority:_____   Date: _____

**Returned because:   *Resubmit this form when corrections are made.**

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible.*

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments.*

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.

☐ 6. Inappropriate.*

CGO Staff Signature: _____

| OFFICE USE ONLY | |
|---|---|
| **Initial Submission** | **CGO Initials:** _____ |
| Date UGI Recd:_____ | |
| Date CGO Recd:_____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender:_____ | |
| **2nd Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd:_____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |
| **3rd Submission** | **CGO Initials:** _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd:_____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |

**I-128 Back** (Revised 11-2010)                                                           **Appendix G**

X

APR 0 1 2020



**Texas Department of Criminal Justice**

# STEP 2    OFFENDER
GRIEVANCE FORM

Offender Name: Allen "F" Colton    TDCJ # 1123880

Unit: Connally    Housing Assignment: 3C-42 B

Unit where incident occurred: Connally

| OFFICE USE ONLY |
|---|
| Grievance #: 2020058419 |
| UGI Recd Date: FEB 24 2020 |
| HQ Recd Date: FEB 27 2020 |
| Date Due: 4-4 |
| Grievance Code: 200 |
| Investigator ID#: 12704 |
| Extension Date: |

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be Specific).**  *I am dissatisfied with the response at Step 1 because...*

I am filing this step 2 because my restrictions make readily clear that I am not to be housed in an area with no "Extreme Temperature" or "No Humidity Extremes" this is mandated by both the medical Department and Psychiatral Personnel of UTMB. Continuing to house me where the heat index can exceed 88 degrees is cruel and unusual punishment in violation of the U.S. Constitution in particular the Eighth Amendment.

Offender Signature: _Allen "F" Calton_____ Date: _2-21-20___

Grievance Response:

Step 1 addressed your concerns. No further action warranted.

Signature Authority: _____M. LEWANDOWSKI_____ Date: _3/7/20___

Returned because:    *Resubmit this form when corrections are made.*

☐ 1. Grievable time period has expired.
☐ 2. Illegible/Incomprehensible.*
☐ 3. Originals not submitted. *
☐ 4. Inappropriate/Excessive attachments.*
☐ 5. Malicious use of vulgar, indecent, or physically threatening language.
☐ 6. Inappropriate.*

CGO Staff Signature: _____

| OFFICE USE ONLY | |
| --- | --- |
| Initial Submission | CGO Initials: _____ |
| Date UGI Recd:_____ | |
| Date CGO Recd:_____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender:_____ | |
| 2nd Submission | CGO Initials: _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd:_____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender:_____ | |
| 3rd Submission | CGO Initials: _____ |
| Date UGI Recd: _____ | |
| Date CGO Recd:_____ | |
| (check one) ____Screened ____Improperly Submitted | |
| Comments: _____ | |
| Date Returned to Offender: _____ | |

**I-128 Back** (Revised 11-2010)                    **Appendix G**

Original

United States Courts
Southern District of Texas
FILED

FEB 17 2023

2-14-23

Clerk,

Re: Allen "F" Calton v Texas Dept. of Criminal Justice, et al

Find enclosed a $402.00 money order and the Original and Two Copies of:

(1) Find enclosed a $402.00 money order and the Original and Two copies of:

(1) Original 42 U.S.C § 1983 Complant

File the original of the same with the papers that will be in reference to the above styled cause. Also file mark the extra copy of the same and return it to Plantiff in the S.A.S.E. Also enclosed. Along with the extra copy of this cover letter.

Thank you,

Allen "F" Calton

P.S. There are also two step 2 grievanes enclosed for each claim raised in the original complant

Allen "F" Calton # 1123880
Connally Unit
899 FM 632
Kenedy, Tx. 78119

Allen "F" Calton #1123880
Connally Unit
899 FM 632
Kenedy, TX. 78119

7017 3380 0000 6990 2805



RDC 04

77208

U.S. POSTAGE PAID
PM
KENEDY, TX
78119
FEB 14, 23
AMOUNT
**$0.00**
R2306Y152259-7

United States Courts
Southern District of Texas
FILED

FEB 17 2023

Nathan Ochsner, Clerk of Court

U.S. District Court
Office of The Clerk
P.O. Box 61010
Houston, TX. 77208